2020 IL App (1st) 170839
No. 1-17-0839
Opinion Filed May 26, 2020

SECOND DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois, |
| | ) | Criminal Division. |
| v. | ) | |
| | ) | No. 15 CR 12199 |
| JESUS ANAYA, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Evelyn B. Clay, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial in the circuit court of Cook County, the defendant, Jesus Anaya, was found guilty of one count of armed habitual criminal and one count of possession of a firearm by a felon and sentenced to six years imprisonment. On appeal, the defendant solely contends that he should receive a new trial where the State's admitted loss of a video exhibit shown at his trial and relied upon both parties in closing argument denies him his right to a full and complete direct appeal. The defendant maintains that without this video exhibit, he cannot obtain "meaningful appellate review" of his conviction. For the reasons that follow, we affirm.

¶ 2                                  I. BACKGROUND

¶ 3        The defendant was arrested on June 28, 2015, and charged with 15 counts related to his alleged possession of a handgun found in a stolen vehicle from which he fled. The charges included, *inter alia*, armed habitual criminal, armed violence, possession of a stolen motor vehicle, unlawful use or possession of a weapon by a felon, and aggravated unlawful use of a weapon. The State chose to proceed only on two charges: (1) armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2014)), based on the defendant's two prior robbery convictions from 2013, and (2) possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2014)) premised on one of those prior convictions.

¶ 4        The following evidence was adduced at the defendant's bench trial. Officer Andrew Ohlson testified that at about 1 a.m., on June 28, 2015, together with his partner Officer Guadalupe Sanchez, he was in Douglas Park in the vicinity of 1400 Farrar Drive, when he heard what he believed was a car crash. Officer Ohlson looked in the direction of the crashing sound and observed several people pointing at the intersection of Ogden and California Avenues. The officer then saw a red vehicle, which was about 50 yards away, "taking off" at a high rate of speed northbound on California Avenue. The officers entered their marked squad car, exited Douglas Park, and drove towards the intersection. Officer Ohlson observed the red vehicle cross Roosevelt Road and pull over to the side of the road at 1139 South California Avenue. As his partner pulled up next to the red vehicle, Officer Ohlson exited the squad car from the passenger side and approached it. He was about 10 to 15 feet away when he observed the red vehicle's sole occupant, whom he identified in court as the defendant. Officer Ohlson testified that although the defendant had been driving the red vehicle the whole time, after he parked it, he crossed over to the passenger side, opened the passenger side door, and exited the vehicle

through the passenger-side front door. According to Officer Ohlson, after the defendant exited the vehicle, he turned around, threw a large black handgun onto the front passenger seat and then ran eastbound. The officer pursued the defendant on foot and issued a flash message containing the defendant's description and the direction of his flight. The defendant ran about a block away before he was apprehended near 2805 West Taylor Street by other officers.

¶ 5        Officer Ohlson averred that when he returned to the red vehicle, he observed that there was damage to the front passenger side, and that the front driver's side door was inoperable. The officer also noticed that there was no key in the ignition and that there was a flathead screwdriver on the front bench seat of the car. Officer Ohlson identified the handgun recovered by his partner from the front bench seat as the same weapon he had observed the defendant throwing into the car before fleeing on foot. Officer Ohlson further stated that he later ascertained that the red vehicle did not belong to the defendant.

¶ 6        On cross-examination, Officer Ohlson admitted that he only heard and did not see the traffic crash. He also acknowledged that when he first observed the red vehicle, he was standing outside of his marked squad car about 50 yards away and therefore did not see the driver or whether there were any other occupants inside the vehicle. Officer Ohlson stated, however, that during the pursuit, he did not see anyone exit the red vehicle before it pulled over and stopped.

¶ 7        On redirect examination, Officer Ohlson acknowledged that on the date in question his police squad car was equipped with a video dash camera. The officer confirmed that prior to trial he had reviewed the video footage from that camera and stated that it "fairly and accurately" depicted what he observed on the night in question from the moment before the car crash to the foot chase. The video was marked as State's Exhibit 1 and played for the trial

court, while the officer described what was being depicted. The officer stated that the video showed the squad car traveling on Farrar Drive out of Douglas Park to 12th Place and then northbound on California Avenue. Officer Ohlson also said that the video showed the defendant inside the red vehicle, a bright light from the squad car illuminating that vehicle, and the doors of the red vehicle closed throughout.

¶ 8        Before recross-examination, at defense counsel's request, the video was replayed again. Officer Ohlson then acknowledged that the video depicted that during the pursuit the officer lost sight of the red vehicle for about five seconds, during which time he could not see if anyone got out of the vehicle. He reiterated, however, that the doors of the red vehicle were closed throughout the chase, as well as when the vehicle pulled over.

¶ 9        Officer Sanchez testified consistently with Officer Ohlson. He stated that the officers were about 200 to 250 feet away when they initially heard the car crash and observed the red vehicle going northbound on California Avenue. Officer Sanchez added that he drove the police squad car in pursuit of the red vehicle and that, unlike his partner, he at no time lost sight of it. Officer Sanchez averred that aside from the defendant, he never saw anyone else inside the red vehicle. Officer Sanchez further testified that there were no other vehicles between his squad car and the red vehicle when he caught up to it as it maneuvered to park. According to Officer Sanchez, the officers were about 10 to 15 feet away when he drove up to the red vehicle and observed the defendant move from the driver's side to the passenger side and then exit the car before fleeing on foot. Officer Sanchez, however, did not see the defendant do anything else before running eastbound.

¶ 10        Officer Sanchez drove off in pursuit of the defendant and returned to the red vehicle about 60 to 90 seconds later when he learned that the defendant had been apprehended by other

officers. Once back at the red vehicle, through the open front passenger door Officer Sanchez observed a flathead screwdriver and a large black handgun on the passenger side of the vehicle's front bench. He also confirmed that the driver's door was inoperable and that there was damage to the steering column of the car. The officer recovered and inventoried the weapon and screwdriver.

¶ 11     The parties stipulated that no fingerprints were found on the handgun. The State entered into evidence certified copies of the defendants' convictions in case Nos. 13-CR-13318 and 13-CR-15646, for two separate robberies from 2013. The State, however, never moved to have the dash camera video (Exhibit 1) formally entered into the evidence.

¶ 12     After the State rested its case-in-chief, the defendant moved for a directed finding, but his motion was denied. The defendant then took the stand on his own behalf. The defendant testified that on the night in question, together with a friend, whom he only knew as Midnight, he was driving the red vehicle around Douglas Park. The defendant admitted that the vehicle did not belong to him and that he started it with the flathead screwdriver. The defendant stated that Midnight was riding in the front passenger seat but that he exited the vehicle before the police pulled up. The defendant acknowledged that he exited the red vehicle from the passenger side door because the driver's side door "did not work." He testified, however, that he never turned back or threw a gun into the vehicle and instead only fled from the police. The defendant denied that he would have seen a large handgun on the front passenger seat because "he was just trying to get out of the car" and his focus was not on anything on the seat. The defendant explained that this is why he was confused when the police asked him about a gun. He stated that he never searched the vehicle prior to driving off with it and that he never saw Midnight either with a gun or tossing the gun back into the vehicle and therefore had no idea that there

was a gun anywhere inside it. The defendant admitted, however, that he never told the police about Midnight.

¶ 13 In closing arguments, defense counsel initially conceded that a handgun was recovered from inside the red vehicle, which the defendant admitted he stole. Defense counsel argued, however, that the evidence failed to establish beyond a reasonable doubt that the defendant was in the presence of a weapon and knew it was there or that he threw the handgun into the red vehicle before fleeing on foot. In this respect, counsel pointed out two important inconsistencies in the officers' testimony: (1) their statements about how far away they were when they first began their pursuit of the red vehicle and (2) whether they ever lost sight of that red vehicle before it pulled over. Counsel argued that the dash camera video established that there was a loss of sight for a brief period of time when the officers initially began their pursuit and that it was likely that Midnight exited the red vehicle at this time. In addition, counsel also argued that there were no fingerprints on the handgun and that the red vehicle was left unattended for at least a minute once the defendant fled on foot and the officers pursued him. Accordingly, counsel argued that the handgun could have (1) already been in the vehicle before it was stolen, (2) been placed there by Midnight before he exited the vehicle, or (3) been placed there while the police pursued the defendant on foot.

¶ 14 In closing, the State argued that this was an "on-the-scene, direct eyewitness crime" testified to by two unimpeached police officers and that the dash camera video from the police squad car "corroborate[d] exactly what th[ose] officers" said. The State pointed out that the video footage showed that the defendant was still making maneuvers in his car when the squad car pulled up next to it so that there was no time for "this mysterious person," Midnight, to exit the vehicle, close the door, and leave the handgun inside before the police arrived. The State

further argued that it was not credible that the defendant could have failed to see the revolver on the front passenger seat that he crawled over in order to exit the vehicle and that when combined with the defendant's flight from police, this evidence alone overwhelmingly established the defendant's constructive possession of the weapon and therefore his guilt.

¶ 15 The trial court found the defendant guilty. The court noted that the evidence was overwhelming and that both police officers were "very, very credible." The court stated that it did not believe the defendant's testimony at all, particularly regarding the presence of Midnight inside the vehicle. The court found relevant that both officers testified that they only observed one individual inside the red vehicle and that they were only a short distance away when they observed the defendant in the process of getting out. The court stated that the evidence established that the defendant tossed the handgun into the vehicle and that this same handgun was recovered immediately thereafter from the passenger side from which the defendant had fled.

¶ 16 The defendant filed a motion for a new trial, arguing, among other things, that the State had failed to prove that he had constructive possession of the gun because the dash camera video showed that the red vehicle was out of the officer's sight for a period of time, which is when the second offender, who had left the gun in the vehicle, must have fled. The trial court denied the defendant's motion, again reiterating that the trial testimony had overwhelmingly established that one of the officers had observed the defendant in possession of the handgun tossing it back into the vehicle.

¶ 17 At sentencing, the defendant's unlawful use of a weapon by a felon conviction was merged into the more serious armed habitual criminal count, and the defendant was sentenced to the minimum sentence of 6-years imprisonment.

¶ 18　　　　The defendant's motion for late notice of appeal was allowed on April 12, 2017, and the Office of the State Appellate Defender was appointed to represent him on April 28, 2017.

¶ 19　　　　The appellate record was filed on January 22, 2018. After unsuccessful requests to the State to impound the video exhibit showed at trial, on November 6, 2019, the defendant's appellate counsel filed a motion to compel the State to impound the exhibits. On November 8, 2019, the State filed its response, conceding that despite numerous attempts to locate a copy of the squad car dash camera video, it had discovered that the video was purged from all relevant databased and was therefore "missing" and could not be located "despite efforts to do so." The State therefore conceded that it would not be able to impound and provide the exhibit for appeal.

¶ 20　　　　On November 12, 2019, the appellate court entered an order granting appellate counsel's motion to compel the State to impound exhibits. On December 3, 2019, after unsuccessfully attempting to negotiate an agreed motion for summary disposition with the State, appellate counsel filed a motion for summary remand and a new trial arguing that the defendant was entitled to a new trial because the loss of the video exhibit meant that he could not receive an adequate appeal. On December 11, 2019, this court denied that motion, stating that it was doing so "without prejudice" to the defendant's right to raise this same issue in his brief.

¶ 21　　　　　　　　　　　　　　II. ANALYSIS

¶ 22　　　　On appeal, the defendant does not challenge the sufficiency of the evidence used to convict him as an armed habitual criminal. Instead, he solely contends that he is entitled to a new trial because, in the absence of the squad car dash camera video, which the State concedes it lost, the appellate record is insufficient to permit a proper and full consideration of any such sufficiency of evidence claim. For the reasons that follow, we disagree.

¶ 23    Usually, it is the appellant's burden to provide a sufficiently complete record on appeal that will permit proper consideration of the specific claims raised. *People v. Henderson*, 2011 IL App (1st) 090923, ¶ 45; *People v. Sims*, 403 Ill. App. 3d 9, 15 (2010). Any doubts arising from the incompleteness of the record are construed against the appellant, and the trial court is presumed to have heard sufficient evidence and arguments to support its decision. *Sims*, 403 Ill. App. 3d at 16. Nonetheless, there are circumstances when this rule will be relaxed. *Id.* This occurs where the defendant can establish that (1) the record is incomplete due to no fault of his own and (2) the missing record is material to a meaningful review of the contentions raised on appeal, *i.e.*, there is a "colorable need" for the missing portion. *Id.* If the defendant can establish both prongs, the State must show that there are alternative means, which will afford adequate review. *Id.* Whether a defendant has been denied meaningful review as a result of an incomplete record is a question of law, which we review *de novo*. *Id*.

¶ 24    In the present case, the parties agree that the State bears the responsibility for the incompleteness of the record. They dispute, however, whether the video footage is material to a meaningful review of the defendant's appeal. The defendant argues that he has a "colorable need" for the video footage because both parties relied on it in their closing arguments and the trial court viewed the footage twice before making a credibility determination in favor of the State. Accordingly, the defendant contends that, without that footage, the appellate court cannot properly review the trial court's credibility determination. The State, on the other hand, argues that the video footage is neither exculpatory nor material to any credibility determination and that as such it is not indispensable to a sufficiency of evidence challenge. In addition, the State contends that testimony of the State's two eyewitnesses supplies an adequate substitute. For the reasons that follow, we agree with the State.

¶ 25    A review of the trial transcript clearly reveals that, contrary to the defendant's position, the dash camera video footage served a very limited purpose at trial. The State used the video footage during the examination of a single witness, Officer Ohlson. Even then, the State did not introduce the video on direct examination of Officer Ohlson but rather only on redirect to permit the officer to explain his prior testimony with the help of a visual aid. While describing the video footage, Officer Ohlson acknowledged that it showed that, while in pursuit, he lost sight of the red vehicle for about five seconds. After this, the video was not used by either party in the examination of any of the remaining witnesses at trial. Particularly, it was not used by defense counsel to impeach Officer Sanchez's testimony that he never lost sight of the red vehicle while driving the squad car with Officer Ohlson. Moreover, even though the video was numbered as an exhibit during trial, it was never formally placed into evidence at the end of the State's case-in-chief.

¶ 26    Accordingly, it is unsurprising that the trial court did not consider the video footage material in finding the defendant guilty. The defendant himself concedes that in issuing its verdict, the trial court nowhere mentioned the video footage. Instead, the trial court relied on the testimony of the two police officers, both of whom it found very credible, and held that their testimony overwhelmingly established that the defendant was alone in the vehicle when it stopped and that he threw the handgun into the passenger side of that vehicle before fleeing from the officers on foot.

¶ 27    The defendant, nonetheless, argues that because the verdict was premised on the trial court's credibility determination in favor of the two officers, who disagreed about whether they ever lost sight of the red vehicle during their pursuit, without the dash camera video footage, this appellate court is without a sufficient record from which to review the officers' veracity.

The defendant, however, misses the point. The trial court expressly found that the defendant threw the handgun into the red vehicle after he had already pulled over. The trial court therefore believed the testimony of Officer Ohlson. Accordingly, any alleged impeachment regarding Officer Sanchez's loss of sight of that red vehicle, while in pursuit, is irrelevant to the trial court's credibility determination and therefore to the defendant's sufficiency of evidence challenge. As such, the defendant's claim that it would be impossible for us to assess the trial court's credibility determination without the footage is simply untrue. See, *e.g.*, *People v. Banks*, 378 Ill. App. 3d 856, 866-67 (2007) (holding that the defendant failed to articulate a "colorable need" for a missing videotape where he could not show how the videotape was "exculpatory or contradictory to any other evidence presented at trial" and therefore material to the points raised on appeal).

¶ 28 In coming to this conclusion, we find the decision in *People v. Appelgren*, 377 Ill. App. 3d 137 (2007), cited to by the defendant inapposite. In that case, the defendant was charged with telephone harassment after he left three threatening voicemail messages on the victim's answering machine. *Id.* at 138-139. After hearing the messages, the victim transferred the messages onto an audio cassette tape and gave them to the police. *Id.* At the defendant's trial, the State introduced and played the audiotape for the jury, but the court reporter failed to transcribe its content. *Id.* During closing arguments, the State argued that "the nature of the messages and the tone of the defendant's voice when he left" them was clearly indicative of his intent to threaten, abuse, and harass the victim. (Emphasis omitted.) *Id.* at 144. After the defendant was convicted, it was discovered that the audiotape was missing. *Id.*

¶ 29 On appeal, the defendant claimed that the absence of the audiotape prevented him from obtaining meaningful appellate review because he could not challenge the basis of his

conviction. *Id.* at 138, 140. The appellate court agreed, finding that the missing audiotape was crucial in assessing the defendant's sufficiency of evidence challenge, where the defendant admitted to having made the calls but disputed the State's claim that he intended to threaten the victim. *Id.* at 144. The appellate court held that because the audiotape formed the basis of the State's case, the defendant's right to appeal had been impaired and he was entitled to a new trial. *Id.* at 145. In coming to this conclusion, the court also found relevant that the jury had asked to rehear the messages on the missing audiotape during deliberations, which itself established its importance. *Id.* at 144.

¶ 30    Unlike the missing audiotape in *Applegren*, the dash camera video footage in the instant case was not an indispensable piece of evidence that formed the basis of defendant's conviction. Here, Officer Ohlson's unimpeached testimony established that after the red vehicle had already pulled over, he saw the defendant exit from the front passenger side, turn around, and toss a black handgun inside. Officer Ohlson also witnessed the subsequent retrieval of the black handgun from the front passenger side of the vehicle a few minutes later. The absence of the red vehicle in the dash camera footage for a few seconds during the pursuit before it pulled over was acknowledged by Officer Ohlson during his testimony. More importantly, the audiotape was not "a basis of the State's case" against the defendant.

¶ 31    Finally, unlike in *Applegren*, in which the audiotape at issue was not transcribed by the court reporter and no adequate alternative to the missing recording was available, the court reporter in this case transcribed Officer Ohlson's entire description of what was occurring on the video footage during his testimony. Accordingly, the record before us contains an adequate alternative to the missing video. Therefore, its absence does not deprive the defendant "of a sufficient record to permit a proper and full consideration of his claims." *Id.* at 145.

¶ 32                                    III. CONCLUSION

¶ 33          Since the defendant does not otherwise challenge the sufficiency of the evidence or raise

any other claims in his appeal, we affirm his conviction and sentence.


¶ 34          Affirmed.

**No. 1-17-0839**

| | |
|---|---|
| **Cite as:** | *People v. Anaya*, 2020 IL App (1st) 170839 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-12199; the Hon. Evelyn B. Clay, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and _____, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and _____, Assistant State's Attorneys, of counsel), for the People. |